IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs April 3, 2018

## STATE OF TENNESSEE v. KENNETH CHANDLER

**Appeal from the Criminal Court for Shelby County**
**No. 13-06077        John Wheeler Campbell, Judge**
_____

### No. W2015-01945-CCA-R3-CD
_____

A Shelby County jury convicted Kenneth Chandler, the Defendant, of aggravated robbery. He received a sentence of eleven years in the Department of Correction. After filing a notice of appeal with this court, the Defendant filed a motion requesting that the court stay his direct appeal so that he might seek coram nobis relief. This court granted the Defendant's motion to stay his direct appeal, and the Defendant filed a petition for writ of error nobis relief in the trial court. Following a hearing, the coram nobis court found that statements from the Defendant's fellow inmates were newly discovered evidence but that the evidence was not admissible as substantive evidence at trial and denied relief. On appeal, the Defendant argues that: (1) the evidence was insufficient for a rational juror to have found him guilty beyond a reasonable doubt; (2) the trial court abused its discretion by failing to properly act as the thirteenth juror; and (3) the coram nobis court erred in denying his error coram nobis petition. After a thorough review of the facts and applicable case law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and J. ROSS DYER, JJ., joined.

Christopher G. Britt, Germantown, Tennessee, for the appellant, Kenneth Chandler.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Amy P. Weirich, District Attorney General; and Kirby May, Shaun Schielke, and Greg Gilbert, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Factual and Procedural History

On December 12, 2013, the Shelby County Grand Jury indicted the Defendant for aggravated robbery. The Defendant was tried by a jury in February 2015, but this trial ended in a mistrial.

At the Defendant's second trial, Diane Frazier testified that she had worked at the Exxon located at 1300 South Germantown Road for approximately two years at the time of the offense. She noted that the Exxon building had two exits: one on the south side of the building and one on the north side of the building. The store had at least twelve exterior and interior security cameras. On the evening of July 20, 2013, Ms. Frazier was the only employee working at the Exxon store. Around 9:40 p.m., she was sweeping in front of the south door when a white male with reddish brown hair and thin facial hair wearing blue jeans, a baseball cap, and a long-sleeve shirt under a T-shirt entered the store. Ms. Frazier stated that the man's right eye looked smaller or was more closed than the left eye. She identified the Defendant as the man who entered the store that night. Ms. Frazier walked behind the counter and put on her glasses because the Defendant had walked up to the beer section of the beverage cooler, and Ms. Frazier knew she would need to check his identification if he made a purchase. The Defendant approached the counter with a pack of beer, and Ms. Frazier scanned the beer. She asked the Defendant for identification, and he asked to purchase some cigarettes. Ms. Frazier picked out the cigarettes and turned back around to the counter when the Defendant said, "F--- this" and pointed a gun in her face. The Defendant said, "Give me the till[,]" and Ms. Frazier "hollered" and ducked beneath the counter. The Defendant told her to get up. She attempted to open the money drawer of the cash register, but because she had already scanned the beer, she needed to type in a valid birth date before the drawer was opened.

Ms. Frazier was eventually able to open the money drawer, and she began putting bills in the bag. The Defendant told her not to put coins in the bag and to put the beer and cigarettes in the bag. Ms. Frazier handed the Defendant the bag with the money, beer, and cigarettes. The Defendant began to walk towards the north door, and Ms. Frazier told him that door was locked. The Defendant turned around and walked out of the south door of the Exxon building. Ms. Frazier then pushed the panic button and called the police. Officers from the Germantown Police Department arrived, and Ms. Frazier described the robbery. She gave a statement to Detective Ryan Carter approximately an hour after the offense. The officers dusted the Exxon building for fingerprints and viewed the security camera footage. Ms. Frazier stated that she thought she was going to die when the Defendant pointed the gun at her.

On August 12, 2013, Detective Carter came to the Exxon and showed Ms. Frazier a photographic lineup. She identified the photograph of the Defendant as the perpetrator of the robbery and signed and dated the photograph. Ms. Frazier explained that it took her about three or four minutes to identify the Defendant's photograph because "[she] just took [her] time and went from picture to picture."

On cross-examination, Ms. Frazier agreed that, when she gave a statement to Detective Carter on the night of the robbery, she was unsure about the Defendant's facial hair. She agreed that she also could not remember the color of the Defendant's baseball cap. She stated that her memory of certain details became better over time because she was scared when she gave a statement to Detective Carter on the evening of the offense. Ms. Frazier testified that she watched the Defendant walk around the Exxon building after the robbery, and at about the same time that she lost sight of the Defendant, a white truck drove through the parking lot. She told Detective Carter about the white truck when she gave her statement, but she did not know whether the Defendant got into the white truck after the offense. Ms. Frazier did not see the white truck in the Exxon's parking lot prior to the robbery. She stated that, even though she believed she was going to die during the offense, her fear did not affect her memory of the Defendant's appearance because she began watching the Defendant before he approached the counter and pointed a gun at her.

Officer Kevin Phelan testified that he had worked for the Germantown Police Department for approximately six years. On July 20, 2013, Officer Phelan received a call about an armed robbery that had occurred at the Exxon station at 1300 South Germantown Road. He initially learned from dispatch that the robber left the Exxon on foot, but later he learned that "the male subject had fled in a vehicle westbound on Wolf River in a white pickup." Based on this information, Officer Phelan drove westbound on Wolf River Boulevard searching for the suspect. When he did not see anyone matching the description of the suspect, he went to the Exxon building. Officer Phelan arrived at the Exxon and asked Ms. Frazier, who was "visibly upset[,]" to unlock the Exxon's door. The manager of the Exxon arrived, and they viewed the footage from the security cameras. After viewing the security camera footage, Officer Phelan confirmed that the suspect did not leave the Exxon's parking lot in the white truck.

Officer Sean Carlson testified that he worked for the Germantown Police Department and assisted in the investigation of the aggravated robbery at the Exxon on July 20, 2013. Officer Carlson was the "Crime Scene tech" and "lifted some latent fingerprints of possible value . . . from inside the Exxon." He explained that he tested the exterior and interior of the south door, the door of the beer cooler, and the counter for fingerprints.

Detective Ryan Carter testified that he responded to the Exxon on July 20, 2013, regarding the aggravated robbery that had occurred there. When he arrived, Officers Phelan and Carlson were photographing the scene and dusting for fingerprints. Detective Carter took a statement from Ms. Frazier and prepared a "be on the lookout" alert based on a still photograph of the Defendant obtained from the security camera footage. On August 12, 2013, Detective Carlson showed Ms. Frazier a photographic lineup that included a photograph of the Defendant. The Defendant was later arrested by the Garland County Sheriff's Office in Arkansas.

On cross-examination, Detective Carlson testified that he watched the surveillance video from two interior cameras and did not watch any of the footage from the exterior cameras. He explained that he did not research the white truck that was in the Exxon parking lot at the time of the aggravated robbery because no further information could be obtained from the surveillance video footage. Detective Carlson also checked for additional footage of the white truck captured by other businesses near the Exxon.

Lieutenant Nicholas Godwin of the Uniform Patrol Division of the Germantown Police Department testified that he responded to the Exxon on July 20, 2013, around 10 p.m. Once Lieutenant Godwin had preserved the crime scene, he contacted Lieutenant Bill Stemmler of the Investigations Department, who assigned Detective Carter to investigate the aggravated robbery. Lieutenant Godwin also viewed some of the footage from the security cameras at the Exxon to try to develop a suspect. After he determined that the Defendant did not leave the Exxon parking lot in the white truck, he passed on that information to other officers working the night shift.

Dr. Jeffrey Neuschatz testified for the Defendant. He stated that he was the chair of the psychology department of the University of Alabama at Huntsville. After the trial court declared Dr. Neuschatz an expert in the field of cognitive psychology, Dr. Neuschatz testified that he had reviewed the discovery and police reports in the Defendant's case. Dr. Neuschatz explained that memory is fluid and that individuals add information into and edit information out of their memories. He stated that memories or events that happen quickly "are more susceptible to errors." He defined "exposure time" as "the amount of time you have to witness or to study the information that you're trying to remember." Dr. Neuschatz defined "retention interval" as "the amount of time between when you study and when you're tested[.]" He explained that "the shorter the retention interval, the better your memory is going to be." He stated that it was unlikely that someone's memory of an event would get better over time because of the retention interval. In his opinion, the retention interval between the offense and Ms. Frazier's identification of the Defendant's photograph in the spread was long. Dr. Neuschatz stated that the robbery was a high-stress situation. He explained that stress made a person's memory worse. He defined "weapon focus" as:

the idea [that] when there's a weapon presence in a scene, it's an attentional magnet, so people look at the weapon. [W]hen they look at the weapon, they can't be looking at other aspects of the scene, so their memory for other aspects of the scene is worse when there's a weapon present.

Dr. Neuschatz testified that things that cover a person's hairline, such as a hat, "make[] it more difficult to identify people accurately." Regarding eyewitness identifications, he stated that "the correlation between confidence and accuracy is very, very low, so confidence is not a good predictor of whether people are accurate in their identifications." Thus, he stated that Ms. Frazier's confidence in her identification of the Defendant did not necessarily correlate to an accurate identification. Dr. Neuschatz stated that "expectation" referred to "the belief that the person who you are trying to identify or the suspect is in the line-up before you see the line-up." He explained that "[i]t's unclear if [having an expectation] increases the likelihood of a false identification[,]" "[b]ut what it does increase the likelihood of is the person's going to make a choice from the line-up." Thus, he believed that, if Ms. Frazier had been told that a suspect had been arrested, that expectation would have made her more likely to select someone from the lineup. He also defined "cross-race identification" as "the idea that it's more difficult to identify people who are of a different race than you are."

On cross-examination, Dr. Neuschatz testified that, when an individual makes multiple identifications of a defendant, any identification after the initial one can be influenced by the choice of the first identification. He agreed that the photographic lineup presented to Ms. Frazier fit into the U.S. Department of Justice's best practice guidelines for lineups.

The jury found the Defendant guilty of aggravated robbery. The trial court sentenced the Defendant to eleven years in the Department of Correction. The Defendant filed a timely motion for new trial, which the trial court denied on August 19, 2015. On November 3, 2015, the Defendant filed an untimely notice of appeal and a motion asking this court to waive timely filing in the interest of justice. This court granted the Defendant's motion to waive the timely filing of the notice of appeal.

*Coram Nobis Proceedings*

On April 29, 2016, the Defendant filed a motion to stay his direct appeal to allow him to file a petition for writ of error coram nobis. The Defendant subsequently filed a petition for writ of error coram nobis. This court granted the Defendant's motion to stay his direct appeal on June 9, 2016. In his petition, the Defendant asserted that, while he was in the yard of the Morgan County Correctional Facility, another inmate, Joseph

Rutledge, confessed to committing the aggravated robbery at issue. The Defendant asserted that this information was newly discovered because he did not know Mr. Rutledge prior to his incarceration. Two other inmates, Scott Deadrick and Christopher Dunn, gave depositions recounting the details of Mr. Rutledge's confession. The Defendant asked the coram nobis court to hold an evidentiary hearing and either acquit him of the aggravated robbery or grant a new trial based on the newly discovered evidence. The Defendant attached transcripts of Mr. Dunn's and Mr. Deadrick's depositions to his petition. The coram nobis court conducted evidentiary hearings on February 17 and March 10, 2017; however, the transcripts from these hearings were not included in the record on appeal.

On May 5, 2017, the coram nobis court entered an order denying relief. The coram nobis court found that the evidence of Mr. Rutledge's confession was newly discovered. The coram nobis court also found that Ms. Frazier was a very credible witness at trial. The court concluded that, regarding the Defendant's newly discovered evidence, there were "inconsistencies that create serious doubt that this new evidence may have resulted in a different judgment." The coram nobis court noted that the inmates testified at the hearing that Mr. Rutledge's confession occurred in different places; one inmate stated it occurred during GED class, and another stated it occurred in the exercise yard. The coram nobis court also noted inconsistencies in the physical appearances of the Defendant and Mr. Rutledge. The inmates testified that Mr. Rutledge was shorter and smaller than the Defendant and did not have a lazy or small right eye. The coram nobis court also "consider[ed] the fact that Mr. Rutledge was willing to testify that he did not do this crime or confess to committing this crime." Thus, the coram nobis court concluded that the inmate's testimony could not be admitted as substantive evidence and "could only be used as impeachment for a prior inconsistent statement." The coram nobis court concluded that "the newly discovered evidence d[id] not give rise to proof that may result in a different judgment."

The Defendant filed an untimely notice of appeal and a motion asking this court to waive the timely filing requirement in the interest of justice. This court granted that motion and consolidated the Defendant's direct appeal and error coram nobis appeal.

## II. Analysis

### Sufficiency of the evidence

The Defendant argues that the evidence at trial was insufficient for a rational juror to have found the Defendant guilty beyond a reasonable doubt of aggravated robbery because the State did not introduce a weapon, the video recording of the offense was grainy, and law enforcement did not conduct a thorough investigation. Additionally, the

Defendant argues that Ms. Frazier's testimony was not credible because she could not remember many details of her assailant's appearance. The State contends that the evidence was sufficient for a rational juror to have found the Defendant guilty of aggravated robbery beyond a reasonable doubt.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

The identity of the perpetrator is "an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Identity may be established with circumstantial evidence alone, and the "jury decides the weight to be given to circumstantial evidence, and [t]he inferences to be drawn from such evidence . . . ." *Id.* (internal quotation marks omitted). The question of identity is a question of fact left to the trier of fact to resolve. *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

Aggravated robbery, as indicted in this case, is robbery that was "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. § 39-13-402(a)(1) (2013). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2013). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a) (2013).

Here, when the evidence is viewed in the light most favorable to the State, we conclude that the evidence was sufficient for a rational juror to have found the Defendant guilty of aggravated robbery beyond a reasonable doubt. Ms. Frazier testified that she observed a white male with reddish brown hair and thin facial hair wearing blue jeans, baseball cap, and a long-sleeve shirt under a T-shirt enter the store where she was working on July 20, 2013. Ms. Frazier stated that the man's right eye looked smaller or was more closed than the left eye. After beginning to purchase beer and cigarettes, the man pointed a gun at Ms. Frazier and ordered her to put the money from the cash register into a bag. The man then took the money, beer, and cigarettes and left the store. Ms. Frazier later identified the Defendant as the robber from a photographic spread and identified him in court. Ms. Frazier stated that she thought she was going to die when the Defendant pointed the gun at her. The jury clearly credited Ms. Frazier's identification of the Defendant by finding the Defendant guilty of aggravated robbery, as was its prerogative. As noted above, questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *Bland*, 958 S.W.2d at 659. The Defendant is not entitled to relief on this ground.

### Thirteenth Juror

The Defendant asserts that the trial court erred in failing to properly fill its role as the thirteenth juror. He argues that the trial court did not independently assess the weight of the evidence at trial and instead focused on the sufficiency of the evidence. He also contends that the trial court failed to independently assess the credibility of the witnesses. The State argues that, "the trial court explicitly exercised its duty as thirteenth juror and found that the verdict was not contrary to the weight of the evidence."

Rule 33(d) of the Tennessee Rules of Criminal Procedure states, "The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." Tenn. R. Crim. P. 33(d). This rule is the modern equivalent of the "thirteenth juror rule" and requires the trial court to weigh the evidence and grant a new trial "if the evidence preponderates against the weight of the verdict." *State v. Blanton*, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996). Our supreme court has stated that this rule "imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case[] and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995). When a trial judge overrules a motion for new trial, absent any evidence that the trial court expressed dissatisfaction or disagreement with the weight of the evidence or the verdict, this court presumes that the trial judge has served as the thirteenth juror and approved the jury's verdict. *Id.* Once the trial court fulfills its duty as the thirteenth juror and imposes a judgment, appellate review is limited to determining the sufficiency of the evidence.

*State v. Moats*, 906 S.W.2d 431, 435 (Tenn. 1995) (citing *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993)).

At the motion for new trial hearing, the trial court stated, "The fact that they came back and returned a verdict of guilty the Court affirmed at the time because it did not -- it wasn't against the weight of the evidence or the law. I have not seen anything that makes me feel differently." The trial court also explicitly stated that it affirmed the jury's verdict. Thus, the trial court fulfilled its duty as the thirteenth juror. The Defendant is not entitled to relief on this ground.

*Error Coram Nobis Petition*

Lastly, the Defendant argues that the coram nobis court erred in denying his petition for coram nobis relief. He asserts that the coram nobis court incorrectly weighed the evidence presented at the hearing by placing more weight on Ms. Frazier's testimony at trial and Mr. Deadrick's affidavit. The State notes that the Defendant failed to include a transcript of the coram nobis hearing, and thus, this court must presume that the coram nobis court's ruling was supported by the evidence. Additionally, the State contends that the coram nobis court acted within its discretion in denying coram nobis relief.

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999) (internal citation omitted). Tennessee Code Annotated section 40-26-105(b) provides that coram nobis relief is available in criminal cases as follows:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Tenn. Code Ann. § 40-26-105(b).

Unlike the grounds for reopening a post-conviction petition, the grounds for seeking a petition for writ of error coram nobis are not limited to specific categories. *See Harris v. State*, 102 S.W.3d 587, 592 (Tenn. 2003). "Coram nobis claims may be based

upon any 'newly discovered evidence relating to matters litigated at the trial' so long as the petitioner establishes that he or she was 'without fault' in failing to present the evidence at the proper time." *Id.* at 592-93. Coram nobis claims are "singularly fact-intensive," are not easily resolved on the face of the petition, and often require a hearing. *Id.* at 593.

> [I]n a coram nobis proceeding, the trial judge must first consider the newly discovered evidence and be 'reasonably well satisfied' with its veracity. If the defendant is 'without fault' in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence *may have* led to a different result.

*State v. Vasques*, 221 S.W.3d 514, 527 (Tenn. 2007) (emphasis in original). In determining whether the new information may have led to a different result, the question before the court is "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the results of the proceedings might have been different." *Id.* (citing *State v. Roberto Vasques et al*, No. M2004-00166-CCA-R3-CD, 2005 WL 2477530, at *13 (Tenn. Crim. App. Oct. 7, 2005)). The decision to grant or deny coram nobis relief rests within the sound discretion of the trial court. *Vasques*, 221 S.W.3d at 527-28.

In this case, the Defendant did not file a transcript of the coram nobis hearing in the appellate record. The appellant bears the burden of preparing an adequate record on appeal, *see State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993), which includes the duty to "have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). This court is precluded from considering an issue presented for review when the record is incomplete and does not contain a transcript of the proceedings relevant to the issue, or portions of the record upon which the appellant relies. *Ballard*, 855 S.W.2d at 560-61 (citing *State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988). Moreover, if the appellant fails to file an adequate record, this court must presume the trial court's ruling was correct. *State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993). Because the Defendant failed to file an adequate record, we must presume the coram nobis court correctly concluded that the Defendant's newly discovered evidence may not have led to a different result at trial. The Defendant is not entitled to relief on this ground.

### III. Conclusion

Based on the aforementioned reasons, we affirm the judgment of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE